# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA
# ERIE DIVISION

| | |
|---|---|
| CHASE OLSEN and <br> SHERREE OLSEN <br><br> *Plaintiffs,* <br><br> VS. <br><br> J.W. DIDADO ELECTRIC, LLC <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. \_\_\_1:18cv292\_\_\_ <br> ) <br> ) JURY TRIAL DEMANDED <br> ) <br> ) <br> ) |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW Plaintiffs Chase Olsen (hereafter "Chase") and Sherree Olsen ("Sherree") who file this Original Complaint against Defendant J.W. Didado Electric, LLC ("Didado"). Plaintiffs respectfully shows the Court as follows:

### I. INTRODUCTION

1. This case arises from the catastrophic personal injuries and damages Plaintiff Chase Olsen suffered due to a tragic helicopter crash that occurred on April 8, 2018 at approximately 5:25 PM near Smethport, PA in McKean County. (NTSB Accident No. ERA18FA122). At all relevant times, Chase was working as employee of High Line Helicopters ("HLH") as a pilot flying a MD Helicopter 600. At all relevant times, Chase was working as an independent contractor with two linemen from Defendant Didado, whose employees' negligence proximately caused the crash. Chase was the only survivor.

2. First Energy Corp. hired Didado to perform electrical contract work for a project near the crash site. In turn, Didado retained HLH as an independent contractor to provide a pilot to fly Didado personnel on high-voltage transmission power lines and electrical structures. For the job in question, Didado's personnel included Michael Koon (lead linemen) and Shane Filkins (apprentice linemen). The crash was proximately caused by Didado's negligence, specifically through its personnel, whose negligent acts and omissions proximately caused a massively heavy, Overhead Static Wire under considerable side angle tension to not only drop but launch and immediately pull the helicopter Chase was piloting into the power line structure causing a violent collision.

3. In the aftermath, Chase was life-flighted from the accident scene and received emergency medical care. He has already undergone extensive medical treatment (including numerous surgeries and procedures) and will require extensive rehabilitation in the future. Many of his injuries are severe, permanent, and are life-altering. In sum, Chase and Sherree have suffered extraordinary damages and injuries due to this preventable crash.

## II. PARTIES

4. Plaintiffs Chase Olsen and Sherree Olsen are residents and citizens of the State of Utah. Chase and Sherree are a married couple with minor children.

5. Defendant J.W. Didado Electric, LLC is a limited liability corporation formed in Delaware with a principal place of business in Akron, Ohio. Didado's corporate headquarters is located at 1033 Kelly Ave, Akron, OH 44306.

6. Didado is registered as a foreign limited liability company in the State of Pennsylvania (Entity No. 4365067). Didado can be served through its registered agent of process, Corporation Service Co. located at 2595 Interstate Dr Suite 103, Harrisburg, PA 17110 (Dauphin County). Didado is owned by Quanta Services, Inc. ("Quanta Services"). Quanta Services a Delaware corporation with its principal place of business in Houston, Texas. Didado is listed as a "Quanta Services Company" on its website.

### III. JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) as Plaintiffs are Utah residents and Defendant is an Ohio corporation with a principal place of business in Ohio. Complete diversity exists and has at all material times. Further, the amount in controversy in this case exceeds $75,000, excluding interests and costs.

8. This Court has personal jurisdiction over Defendant Didado because it conducts substantial business in Pennsylvania and within this district. As such, Didado has sufficient minimum contacts with the State of Pennsylvania. Further, Didado intentionally avails itself to the jurisdiction of this Court because it does substantial business in the State of Pennsylvania and enjoys business from consumers and markets in this state. More specifically, this cause of action arises out of Didado's contacts within the State of Pennsylvania. This Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this district and division under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district and Defendant is subject to personal jurisdiction in this district.

## IV. FACTS

### *Background on J.W. Didado Electric*

10. J.W. Didado Electric holds itself out as "one of the largest and most successful electrical contracting companies in the Midwest." Didado offers a variety of services including transmission & distribution, substation construction/renovation/repair, power restoration & repair, storm restoration, contract/preventive maintenance, backup power system installation, and troubleshooting & testing.

11. Didado's holds itself out as "a recognized leader in the residential, commercial, institutional, industrial and high-voltage electric business as well as a trusted storm restoration partner of many of the country's largest electric utilities. A member of the Quanta Services family of companies, J.W. Didado has the financial strength, employees, equipment and bonding capacity to handle the largest and most complex projects." For transmission & distribution projects, Didado represents "J.W. Didado Electric's High Voltage Group provides expert electrical design, engineering, construction, installation and maintenance services of transmission, distribution, and substation facilities and systems. J.W. Didado has the knowledge, experience and resources to complete any size project on time and on budget."

12. Didado's website represents the following with respect to safety and training:

> Safety Is Our Culture
>
> J.W. Didado Electric is committed to providing a safe work environment for all of its employees. We start this commitment by pledging to our employees that we will do everything in our power to bring them home

safely to their families at the end of each work day. This commitment starts with senior management supporting the culture of safety and compliance.

At J.W. Didado, safety takes precedence over all business pursuits and practices. The company is dedicated to continuously improving our safety practices and policies. We accomplish this by incorporating proactive safety and risk management systems to mitigate and eliminate hazards on all of our work sites. To achieve this, J.W. Didado creates an environment that places the highest value on the health and safety of the employee, customer, client and community. These objectives empower us to embrace a standard of safety excellence.

13. Quanta Services's website describes Didado as "[a] full-service electrical contractor providing high-performance solutions to a variety of commercial, industrial, and residential customer needs. The company's readily available manpower and equipment allow it to successfully perform on projects of any size or type."

14. Quanta Services's website further states the following about Didado:

Areas of Expertise

Substation construction at voltages up to 500kV including everything from new construction to existing energized equipment integration, protection and control. Distribution and Transmission construction at voltage levels up to 500kV including new construction with various tower configurations, demolition and rebuild, re-conductor, fiber, helicopter, phase raising, maintenance, emergency work, and storm. Facility electrical construction including Commercial, Industrial, Healthcare, Education, Institutional, and Residential markets.

***First Energy Corp. Hires Didado for Electrical Work Near Smethport, PA***

15. Didado has been retained as an electrical contractor by First Energy Corp. on numerous projects in Pennsylvania for over a decade. First Energy owns the transmission lines at or near the site of the helicopter crash in question.

16. In its regular course of business, First Energy elicits bids through a Request for Proposal for various work on its transmission lines.

17. First Energy Corp. is currently in the process of building a new, 15-mile project in McKean County, including the site of the helicopter crash in question. Didado was hired by First Energy Corp. to perform electrical contractor related work at or near the site of the helicopter crash in question.

### *Background on Chase Olsen and HLH*

18. Prior to the crash in question, Plaintiff Chase Olsen had been flying helicopters for approximately seven years and has logged more than 6,000 hours of flight time prior to the helicopter crash in question.

19. Near the end of 2015, Chase was hired by High Line Helicopters ("HLH"). HLH is a West Virginia based company with 10-12 employees.

20. Chase signed an employment agreement with HLH but has never signed any type of contractual agreement with Didado or Quanta. Moreover, as part of his employment with HLH, Chase has been compensated directly by HLH. He has never been compensated by one of the companies that hire HLH for work.

21. Chase received flight training at A Flight Above in Utah, received further training through his work experience at HLH, and has received different flight certifications over the years. Further, as part of his employment with HLH, Chase's flight skills are evaluated though an annual proficiency check.

22. HLH provides independent contractor services to electrical contractor companies. HLH pilots fly helicopters and bring electrical contractor employees to high-

rising power lines and electrical structures. During his employment with HLH, Chase worked with Didado, Henkels & McCoy, Inc., L.E. Myers Co, and Southwestern.

23. HLH submits bids for various electrical contactor jobs. If HLH's bid is accepted, HLH flies its pilots out to a specific job location to work with various electrical companies listed above. This business practice occurred with respect to the crash in question. HLH's bid was accepted by Didado and HLH assigned Chase to work this job.

24. Chase's typical job rotation working with various companies lasted approximately three weeks. As part of his job, he would submit a weekly invoice to HLH outlining job tasks, hours logged, and a summary of the work performed.

25. When piloting a helicopter containing electrical contractor personnel, Chase's job was to pilot the helicopter in position, allowing personnel to begin work on the line. After, Chase's job was to steady the helicopter and hold a safe position in the air.

26. Prior to the crash in question, Chase had previously worked on Didado jobs in Pennsylvania with a variety of Didado personnel. Didado's management often encouraged Chase to participate in various jobs whenever possible.

*On April 8, 2018, Didado Linemen Michael Koons Causes the Helicopter Crash*

27. As of April 8, 2018, Chase was about half-way through a three-week rotation for a job working with Didado as an HLH pilot. During this job rotation, Chase was staying in nearby Bradford, PA.

28. Chase would routinely speak with Didado's superintendent Bill Fletcher each morning. Mr. Fletcher would assign Didado personnel to work with Chase each

day. On April 8, 2018 Mr. Fletcher assigned Michael Koons (lead linemen) and Shane Filkins (apprentice linemen) to work with Chase. Mr. Fletcher informed Chase that Mr. Koons had "some helicopter experience" while working for Didado.

29. Chase and Didado employees would have a group meeting each morning to go over the assignments the group needed to complete on a given day. Didado employees had responsibility for identifying any safety hazards for the job and/or electrical structures. Both Chase and Didado personnel would sign off on a job sight analysis ("JSA").

30. Prior to April 8, 2018, Chase had never worked with Mr. Koons or Mr. Filkins from Didado. That morning, Chase met with both in the group meeting. After introducing themselves, the group met to discuss what tasks had to be performed that day, as well as examine the rigging equipment. Didado's primary task on the day in question was clipping, which includes wrapping the armor rod[1] along the wire.

31. An electrical linemen's job includes wrapping an armor rod to reinforce the line from the skid of a helicopter. They are responsible for using a suspension clamp to permanently secure the static line to the structure. On the job in question, the Didado personnel's task was to permanently secure the static line with proper rigging, install armor rod, relocate the static line from the dolly to the suspension clamp and tighten the clamp with the proper torque ratings to the structure. Didado personnel Michael Koons

---

[1] An armor rod is a piece of equipment used to protect electrical cable against bending, compression, abrasion, and other forces.

and Shane Wilkins were responsible for the work described above at all material times on the day of the helicopter crash in question.

32. Two to three days prior to April 8, 2018, there had been inclement weather. However, on April 8, 2018 the weather had begun to clear and conditions were acceptable for Chase to fly the helicopter to assist Didado's personnel. There was slight snow in the morning, light winds, cool temperatures, and clear visibility.

33. The base of operations and landing zone was approximately one-quarter of a mile from the crash site. Typically, Chase and Didado employees would take off at approximately 8 a.m. each morning. However, on the day of the crash in question, Chase, Mr. Koons, and Mr. Filkins took off at approximately 10 a.m.

34. The helicopter in question was a model MD600N. Chase did not experience any known or recognizable problems with the helicopter on the day of the crash.

35. Although the work was completed on the first two structures, the group experienced delays due to Mr. Koons apparent inexperience and difficulty performing work. Specifically, it took several hours longer because Mr. Koons had difficulty wrapping the armor rod, lifting the wire, and utilizing the dolly, a process that any competent linemen knows how to correctly and safely operate.

36. Chase, Mr. Koons, and Mr. Filkins took off in the helicopter to perform work on the third structure. Chase piloted the helicopter into a safe and proper position. At all material times, Chase piloted the helicopter in a safe, steady, and flight-worthy manner.

37. Chase could see the work Mr. Koons was performing, as he was positioned approximately three feet above him in the cockpit. He could observe Mr. Koons again struggling with opening the spring-loading locking gate on the dolly in order for him to wrap the armor rod.

38. At approximately 5:25 PM, Mr. Koons caused the entire power line (weighing approximately 1,800 lbs) to suddenly drop on the helicopter skid. The force and momentum generated by the weight and angle of the line dropping caused the helicopter to be pulled swiftly and uncontrollably towards the H-shaped structure.

39. Despite Chase's attempt to pilot the helicopter away with evasive maneuvers, it was too late. The force caused by the line dropping on the helicopter skid caused it to roll over the structure and crash.

### *Aftermath of the Crash*

40. Chase was pulled from the wreckage and transferred to Bradford Airport by Priority Care Ambulance where he was stabilized. After spending weeks in a Pittsburgh hospital, he was then air-ambulanced to the University of Utah Hospital in Salt Lake City.

41. Chase's catastrophic injuries from the crash include: facial fractures, lower back fractures, fusion of the lumbar spine between L2 and S1, multiple fractures in his left leg, left arm fracture, left ankle fracture, multiple fractures in both of his feet, separation of right-side shoulder cuff, a severe concussion, contusions, severe cuts bruises and abrasions, cardiac bruising, scarring, open wounds, cranial hemorrhage, necrotic tissue, extensive swelling, severe nerve damage, loss of sensation, and trauma.

42. As a result, Chase has undergone numerous operations and procedures to treat these injuries. For example, he had a grade 3 open wound fracture where a rod was placed in his leg from his knee down to his ankle. Because his L4 vertebrae was shattered, surgeons fused the L2-S1 vertebrae together utilizing screws and a plate. Orthopedic surgeons later placed two pins in his left leg and had to reset his right shoulder.

43. Chase has undergone, and continues to undergo, comprehensive physical therapy and rehabilitation for his injuries. He has taken, and continues to take, prescription medication. Chase will require extensive future medical treatment, including surgical procedures and living accommodations to treat his ongoing, life-altering, and injuries.

44. Chase's future job opportunities and earning capacity have been permanently and adversely affected due to his injuries from the crash in question. His physicians have placed numerous restrictions on his activities and functions thus far.

## V. CAUSES OF ACTION

45. An employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment. *Fitzgerald v. McCutcheon*, 270 Pa.Super. 102, 410 A.2d 1270 (1979).

46. In this instance, Didado is vicariously liable for the negligence and wrongful acts of its employees Michael Koons and Shane Filkins that proximately caused the crash in question, as well as Chase's resulting injuries and damages.

47. As an electrical company, Didado is held to a high degree of using reasonable care. *Bailey v. Penn. Elec. Co.*, 409 Pa.Super, 374, 392 (1991) (citing *MacDougall v. Penn. Power & Light Co.*, 311 Pa. 387, 796 (1933); *Yoffee v. Pa. Power & Light Co.*, 368 Pa. 520, 536, 123 A.2d 636, 645 (1956) ("That a transmission line is a dangerous instrumentality is recognized everywhere. No matter where located it is a source of grave peril and the law requires that the possessor of such an instrumentality exercise a high degree of care").

48. Didado was required to use reasonable care in their exercise of control over the power lines they were working on at the time of the crash. Restatement (Second) §414 (Negligence in Exercising Control Retained By Employer):

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

49. Didado is held to the standard of Restatement (Second) §416 (Work Dangerous in Absence of Special Precautions) which states:

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

50. Didado is held to the standard of Restatement (Second) §427 (Negligence as to Danger Inherent in the Work):

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be

Case 1:05-mc-02025 Document 148 Filed 09/26/18 Page 13 of 17

inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

### **COUNT ONE:** *Negligence*

51. Plaintiffs incorporate by reference preceding paragraphs 1 through 50.

52. As an electrical contactor with personnel working on electrical power lines, Didado owed Chase a duty to exercise the degree of care a reasonably careful company would use to avoid harm to others under circumstances described above.

53. Through the acts and omissions of employees, Didado breached this duty of care. Specifically, Mr. Koons's acts and omissions constituted negligence in one or more of the following ways:

> A. Negligent acts and omissions handling the dolly;
> B. Negligent acts and omissions handling the electrical cable;
> C. Negligent acts and omissions causing the line to drop;
> D. Failing to attach the safety (rigging);
> E. Failing to attach the hoist and secure the conductor;
> F. Failure to control the static wire;
> G. Failing to identify obvious safety hazards
> H. Failing to apply and adhere to linemen methods and training, including safety precautions, within the standard of care used by other competent linemen;
> I. Other forms of negligence not yet discovered or known.

54. In addition to and incorporating paragraph (A-I) above, Plaintiffs allege that Didado was negligent in one or more of the following manners:

> A. Failing to properly train and/or supervise its linemen;

    B.    Failing to establish adequate safety procedures and/or enforce policies for its linemen, including, protocol for linemen performing work from the skid of a helicopter;

    C.    Negligently entrusting electrical work to linemen without proper training, knowledge, and/or experience;

    D.    Negligent assigning an incompetent and/or inadequately trained linemen to work on inherently dangerous work involving high-power transmission electrical lines;

    E.    Negligently hiring, supervising, and retaining a lineman who was unqualified, incompetent, and/or reckless.

    F.    Other forms of negligence not yet discovered or known.

55. Didado's negligence, through its acts and omissions listed above, proximately caused the helicopter crash in question, as well as Chase's subsequent injuries and Plaintiffs' damages arising from this incident.

### COUNT TWO: *Loss of Consortium*

56. Plaintiffs incorporate by reference preceding paragraphs 1 through 55.

57. Loss of consortium is recognized as a right growing out of the marriage relationship which the husband and wife have respectively to the society, companionship and affection of each other in their life together. As thus defined and limited, any interference with this right of consortium by the negligent injury to one spouse, should afford the other spouse a legal cause of action to recover damages for that interference.

58. Services that can be compensated include, "whatever aid, assistance, comfort or society" one spouse would be expected to render or bestow upon the other, under the circumstances and in the condition in which they may be placed.

59. As a result of Chase's injuries and damages, Plaintiff Sherree Olsen is entitled to damages arising out of a loss of consortium due to Chase's injuries.

## VI. JURY DEMAND

60. Plaintiffs demand a trial by jury on all claims under the Seventh Amendment of the United States Constitution and in accordance with FED. R. CIV. P. 38. Plaintiffs tender the requisite jury fee upon filing.

## VII. DAMAGES

61. Defendant's negligence has proximately caused Chase's severe personal injuries and damages to Plaintiffs resulting therefrom.

62. Defendant's negligence has resulted in the following damages:

   a. Past and future physical pain and suffering;
   b. Past and future mental anguish;
   c. Past and future physical disfigurement;
   d. Past and future physical impairment;
   e. Medical expenses in the past and future;
   f. Lost wages;
   g. Loss of past and future earning capacity.
   h. Inconvenience;
   i. Distress, embarrassment, humiliation;
   j. Loss of enjoyment of life;
   k. Loss of consortium

## VIII. PRAYER FOR RELIEF

63. For the above reasons, Plaintiffs Chase Olsen and Sherree Olsen respectfully request that citation issue for Defendant J.W. Didado Electric LLC to appear.

After a trial on the merits, Plaintiffs pray that they be awarded a judgment in their favor against Defendant J.W. Didado Electric LLC including the following:

  A. Actual damages;

  B. Special damages;

  C. Reimbursement of costs and expenses;

  D. Pre-judgment and post judgment interest;

  E. Any further relief to which Plaintiffs are entitled to, at law or equity.

Dated: September 26, 2018

            Respectfully submitted,

            **CONNER RILEY FRIEDMAN & WEICHLER**

            /s/ S. E. Riley, Jr.

            ATTORNEY-IN-CHARGE
            S. E. Riley, Jr.
            17 W 10th St.
            Erie, PA 16501
            Tel: (814)-453-3343
            Fax: (814)-455-1572

            **FLEMING, NOLEN & JEZ, LLP**
            George M. Fleming (pro hac vice to be filed)
            Texas Bar No. 07123000
            G. Sean Jez (pro hac vice to be filed)
            Texas Bar. No. 00796829
            Gregory D. Brown (pro hac vice to be filed)
            Texas Bar No. 24078266
            2800 Post Oak Boulevard, Suite 4000
            Houston, Texas 77056
            Telephone: (713) 621-7944
            Facsimile: (713) 621-9638

PEARSON BUTLER
Christian Burridge (pro hac vice to be filed)
Kyle Adams (pro hac vice to be filed)
1802 W. South Jordan Pkwy Suite 200
South Jordan, Utah 84095
Telephone: (801) 495-4104

***Attorneys for Plaintiffs Chase Olsen and Sherree Olsen***